### MARQUETTE et ux. v. CANGELOSI.
### No. 1153.

Court of Appeal of Louisiana. First Circuit. May 22, 1933.

Jos. A. Loret and J. D. Womack, both of Baton Rouge, for appellants.

Taylor, Porter & Brooks, of Baton Rouge, for appellee.

MOUTON, Judge.

Robert Marquette, minor son of Mr. and Mrs. Charles Marquette, was killed in an elevator in a building belonging to defendant situated in the city of Baton Rouge. Plaintiffs are claiming $7,000 damages against defendant for the death of their child. Judgment was rendered rejecting the demand, from which plaintiffs appeal.

Robert Marquette lost his life on December 13, 1930, and was then 13 years, 2 months, and a few days old. Counsel for plaintiffs invoke the attractive nuisance doctrine, and contend that in Louisiana it applies to all boys under the age of 14 years.

The first question is as to whether the elevator in which the boy was killed is an attractive nuisance within the meaning of the rule which governs in such cases.

The Cangelosi building is located at the corner of Boulevard and St. Louis street, Baton Rouge. The door to the street is a swinging door, and, as explained, when opened, comes right back and is automatically closed. The door to the elevator is about six or eight feet from the street door, which has glass panels.

Ed. Sanchez, witness for plaintiffs, who often passed by the building, says you could see the outlines of the elevator from the street but could not say "if you would know what it was."

Justin Cooper, another witness for plaintiffs, says you can see the framework and iron part of the elevator from the street.

Evidently, as the door on the street was a swinging door, it must have been always closed, and it was only by looking through the glass panels that the elevator could be seen.

In the case of Tomlinson v. Vicksburg, S. & P. Ry. Co., 143 La. 641, 79 So. 174, the court held that the doctrine invoked by plaintiff has its application where the dangerous agency is so obviously tempting to children that the owner is guilty of negligence for failing to observe and guard against the temptation and danger.

In the case of Peters v. Pearce, et al., 146 La. 902, 84 So. 198, 199, after approving the ruling in the above cited case, the court added: "Strangers are not liable to children for negligence in carrying on their business beyond what would be their liability to others, as well as children, who are equally free from blame."

It is therefore extremely doubtful if the elevator, situated as it was, and which was used by defendant in his business, could be characterized as an attractive nuisance.

Conceding, however, that the elevator was an attractive nuisance, let us pass to the consideration of plaintiffs' contention that this doctrine applies in Louisiana to all children under 14 years of age, and that, when a child under that age yields to the temptation to play with such a nuisance, the party who maintains it cannot escape liability on the plea that the injuries were due to the negligence of the child.

This contention is based on article 36 of the Civil Code, which fixes the adult age for males at 14 years complete and of females at 12 years complete.

It is conceded by counsel for plaintiffs, if we have a proper appreciation of their brief, that our court in the case of Westerfield v. Levis, 43 La. Ann. 63, 9 So. 52, has taken the common-law view on this subject, but which counsel excuses with the remark that in rendering that decision article 36 of the Code was overlooked.

In that case, the defendant was using iron rollers to grade Coliseum street in the city of New Orleans to which two mules were attached. The machine was left in close proximity to the yard of the plaintiff, exposed, unguarded, and unsecured. The child, Richard, escaped from the residence of his parents, got on the roller, started the mules, fell, and was mortally injured. Richard, the boy killed, was then aged 5 years and 7 months. Though the child was of such tender years, the court referred, with approval, to decisions from other jurisdictions where it had been held that at that period of life a child is prima facie exempt from responsibility, but testimony was, however, admissible to show the contrary. The fact is that in the course of the opinion in the Westerfield Case, the

court referred to the intelligence of the boy, said he was a bright and sprightly child, but was not considered of exceptional capacity, and was not yet endowed with the discernment, discretion, or judgment that it might have had a proper appreciation of the danger which lurked in the moving of the iron rollers upon which he was riding when killed.

In the syllabus of that case, the court adopted the common-law view, where it says: "The conduct of an infant of tender years is not governed by the same rule which applies to an adult. While an adult must be free from fault which contributed to his injury, in order that he may recover, the care and caution required of a child is according to his maturity and capacity and the circumstances of the particular case."

In the 118th La. page 618, 43 So. 252, 255, 8 L. R. A. (N. S.) 480, 118 Am. St. Rep. 391, 10 Ann. Cas. 807 [Lynch v. Knoop], body of decision, in a case wherein damages were claimed for the death of a child, the court expressed itself as follows: "The child who met with her death was bright and intelligent. We have seen that she was eight years old and old enough to fall within the rule of contributory negligence. Westerfield v. Levis Bros., 43 La. Ann. 63, 9 So. 52."

Mr. Justice Breaux was the organ of the court in that case, and was a member of the court when the opinion was rendered in the case of Westerfield v. Levis, and which was referred to by Judge Breaux.

The decision in the 118th La. 618, shows that the court would take into account in such cases questions affecting the intelligence or mental capacity of the child as an important factor in the determination of the issues and that at eight years of age a child could "fall within the rule of contributory negligence."

Again in a later case, Downey v. Baton Rouge Electric & Gas Co. et al., 122 La. 481, 47 So. 837, Mr. Justice Provosty, organ of the court, said that a child between 8 and 9 years of age, who suddenly stepped from a sidewalk, ran ahead of a moving train and was killed, was guilty of contributory negligence.

It was so held in Michael McLaughlin v. New Orleans & Carrollton Railroad Company, 48 La. Ann. 23, 18 So. 703, where a boy of 11 was killed by a street car.

In the cases above cited and many others to which we could refer, it is not believable that the age of the adult fixed in article 36, Civ. Code, referred to by counsel, could have been overlooked or had escaped the attention of the court, as contended for by counsel for plaintiffs.

To apply the provisions of that article in support of the contentions of plaintiffs would, it seems to us, lead to strange and inequitable results. We make this statement because, under the interpretation counsel would give

to that article, a plea of contributory negligence could not be urged by a defendant against a girl who had attained the age of 12 years because she would then have reached the age of puberty, but a boy over 12, but not exactly 14, could be met with that defense on the ground of his lack of responsibility. Evidently, in fixing the adult age for males and females in that article of the Code, the legislator had another purpose in view, which seems indicated in volume 1, Marcadé, page 390, where this author says: 518: "Jusqu'en 1792, les hommes purent se marrier à 14 ans, et les femmes à 12 ans, conformément aux régles du droit romain, consacrées par le législateur francais. Mais on comprit enfin que cette fixation d'age, bonne pour le climat d'Italie, ne pouvait convenir à nos pays septentioneax dans lequels les forces physiques se developpent plus tardirement."

It is unnecessary to give a literal translation of the above quotation from this French author, only to that part applicable to the present controversy, where he says, the fixation of the marriageable age, at 14 for boys and 12 for girls, conformably to the Roman law, was good for the climate of Italy but not of France, where the physical forces of the individual are of more tardy development. The age of puberty so fixed according to the Roman law had, as indicated by the remarks of Marcadé, reference to the bodily strength or development, and not to mental or moral strength. It seems, however, that in France at a later date a broader view was taken, which resulted in advancing the age of puberty to 18 years for boys and 15 years for girls. It may be that the compilers of our Code were impressed with the materialistic conception of the Roman law, or, perhaps, in the interest of marriage, much favored by our laws, fixed the age of puberty at 12 for females and 14 for males. That it was so fixed in the interest of marriage is indicated by article 92, Civ. Code, which permits boys and girls to marry at that age. We cannot accept the construction put on article 36 of the Civil Code by counsel for plaintiffs.

We will now proceed to the discussion of the case under the rule as applied in the Westerfield Case, and the other cases hereinabove referred to.

Mr. Sholar, circulating manager of the Morning Advocate of Baton Rouge, says that in December, 1930, Robert Marquette, the deceased, Earl Broussard, Ed. Sanchez, and Justin Cooper were working under him, delivering papers in the city of Baton Rouge. He says he had warned these boys not to use elevators in office buildings in the city. This was a general warning he had given them. He testifies that on the morning of December 13th, the day Robert Marquette lost his life, he overheard a conversation about 5 o'clock in the morning between those boys in which they

were talking about riding the elevator in the Cangelosi building where the accident occurred. He says they were then in the lobby of the State-Times, Robert Marquette being present, and that he cautioned them against that type of playing, saying that they might get hurt and killed, adding to his admonition that he had heard a boy had been killed in the elevator, and that it was dangerous for them to ride in that elevator.

When these boys were so instructed, Earl Broussard says that Robert Marquette said, "I don't care so long as I am not killed."

Hence there can be no question that the deceased heard when they were cautioned by Mr. Sholar, as above explained. This statement by Marquette does not convey the idea that he saw no danger in riding the elevator, but rather implies that he was willing to take a chance, provided he was not killed. He was over 13 years and 2 months old, a boy, not of dazzling brilliancy, but normal in every respect, bright in his studies, and then in the sixth grade. Indeed, it would be doing violence to the situation to say that this boy, at that age, bright and intelligent, who was delivering papers in Baton Rouge, and for several weeks before had been engaged in the same business for another newspaper, did not have the discernment, after receiving these general specific warnings from Mr. Sholar, to appreciate the dangers that lurked in the operation of that elevator. Besides, it is shown that Earl Broussard was the only boy in that group that was to deliver the Morning Advocate in the Cangelosi building, and that the route of Robert Marquette was in a different section of the city.

The testimony of Earl Broussard and of the other boys, if not all, shows that they realized, with the exception of Broussard, that they had no business in that building, and we have no doubt that Marquette, who unfortunately lost his life, had come to the same realization. In connection with this, it must also be considered that Marquette and the other boys left the lobby of the State-Times, where Mr. Sholar had cautioned them, a little after 5 in the morning, December 13, 1930. They got to the Cangelosi building, about three blocks away, a little after 5, operated the elevator in which Marquette was killed at about 5:30 a. m. In that month of the year it was then quite dark, of which there can be no doubt, as it appears that Earl Broussard used his flash-light while they were operating the elevator. It is impossible not to infer that these boys, including the deceased, could not have failed to realize that at that hour, in the darkness of the night, and after the warnings they had received,

there was danger in riding in this elevator. The proof shows that they pushed the swinging door, which was not locked, got in the building and into the elevator through its door which was ajar about six inches, ran the elevator up and down until the accident occurred.

It is shown by Paul Poydras, then janitor, who operated this elevator, that his hours for operation were between 7 in the morning to 6 in the evening.

Marquette, with the other boys, excepting Earl Broussard, were intruders in that building at that early hour and trespassers. As the building was private property, kept closed, and not open to the public at that hour, under such a state of facts, the attractive nuisance doctrine has not been applied in this state. See 36 A. L. R. page 82 et seq.

We shall, however, concede that the elevator was an attractive nuisance, and that Marquette was not a trespasser, and, taking this broad and liberal view, we must, however, conclude that plaintiffs are debarred from recovery, because deceased was guilty of contributory negligence.

The record shows that in October, 1930, 2 months before the accident, and in the succeeding February, this elevator was inspected by Mr. Edward, an inspector of elevators, and was found in good condition; and the janitor, Poydras, testifies it was in good order in December, 1930, the month in which the boy was killed. The boys, it is true, had been playing in the elevator some time prior to the accident, but of this neither the janitor nor the defendant was aware. Hence it cannot be said that defendant had acquiesced in the operation of the elevator by these boys.

The elevator is manipulated by means of a lever, as it is explained by Mr. Edwards, elevator inspector. If the lever is pushed one side, it goes up, and, if on the other side, it goes down. While these boys were riding up and down in the elevator, it stuck or stopped between the first and second floors. This unfortunate boy, Robert Marquette, shoved his head in the shaft, extended his hand, and evidently turned the lever the wrong way, causing the elevator to go downward, by which his head was crushed, and from which he died almost instantly.

Sad indeed is this case, and most regrettable, but we are constrained, under the rulings of our courts and the weight of authority from the common-law courts, to hold that the deceased was guilty of contributory negligence, and that plaintiffs cannot recover.

Judgment affirmed.