## O'PRY v. BERDON et al.
### No. 1187.

Court of Appeal of Louisiana. First Circuit.
June 30, 1933.

J. C. Hollingsworth, of New Orleans, and J. B. Holloman, Jr., and C. V. Pattison, both of Lake Charles, for appellants.

Hawkins & Pickrel, of Lake Charles, for appellee.

MOUTON, Judge.

Garland O'Pry, minor child of plaintiff, was injured on March 15, 1932, by a car which Mrs. Clarence Berdon was driving. This car was insured against casualties by the Metropolitan Casualty Insurance Company of New York, which is sued, in solido, with Mrs. Clarence Berdon for the damages resulting from the injury.

Louisiana avenue runs north and south through the city of Lake Charles.

Kirby street runs from the west through the city and abuts the avenue on its western line, stops at that point, and does not continue eastward from the eastern boundary of the avenue.

There are paved sidewalks on both the east and west sides of the Louisiana avenue. There are also sidewalks on Kirby street on the north and south sides of that street.

The accident, from which the injury resulted, occurred a little north of a line directly across the avenue from the north sidewalk of Kirby street going eastward and about the center line of the avenue or a little to the east thereof.

The home of plaintiff is east of the avenue and about two blocks south of the line to the east from the point where Kirby street abuts the avenue on its western boundary.

The children of the plaintiff, Armont, a girl, 13 years of age, Garland, 12, and Rodney, 10, were attending the Central School situated about two blocks west of Louisiana avenue. They left that school and proceeded along the north sidewalk on Kirby street going east, towards home about 12:10, for lunch. While crossing the avenue from the north sidewalk of Kirby street, and at about the center of the avenue, Garland was struck by the car Mrs. Clarence Berdon was driving.

Mrs. Berdon was going north on the avenue when the car struck the boy, and was going then, according to her testimony, fifteen or sixteen miles an hour.

She says: "I didn't see the boy until just as I struck him." The evidence shows that Rodney and Armont, the sister, had crossed the avenue when Garland was struck. Mrs. Berdon says, the girl screamed "what made me turn the car," but says also that she did not see his sister, "just heard her scream"; and she testifies no one was in sight, which shows clearly that she did not see Rodney, the other boy, who had first gone across the avenue.

The testimony of Mrs. Berdon shows that she heard the girl scream, then saw the boy, turned to her right, and struck the boy. It is evident, from her testimony, that she did not see him before he was struck, or only at that time, and that she did not see either Armont, his sister, or Rodney, the younger brother, when they went across the avenue ahead of Garland, the injured boy.

Armont, the sister, says she had her foot on the curbing on the east side of the avenue, and did not see when Garland was hit, nor did Rodney, who was then on the sidewalk on the east side of the avenue.

The testimony of Armont, Rodney, and Garland is that they walked across the avenue from the north sidewalk on Kirby street.

James Lebleu testifies he was in Louisiana avenue at the time of the accident, fixing a tire on his car, facing north; saw two or three boys crossing the street. The boy that got hit, he says, was the "last boy crossing," and that the boy was walking. He was then, as brought out on cross-examination of counsel for defendant, about 249 feet from the point where the accident occurred.

The avenue is straight and offered no obstacle to his vision. At that distance he could easily see those children as they crossed the avenue, and discern that the one behind was struck; and it is unquestionably certain that he was the last in line of the three going across.

It was shown, it is true, that charges of bootlegging were made against James Lebleu and that he had been accused of cattle stealing. As his testimony is merely corroborative of the evidence given by Rodney, Garland, and Armont, should it be discarded because of the imputations to which we have referred?

There being no testimony from any witness contradicting the proof of the three children and of James Lebleu that they did not run across the avenue but walked to the other side, we could not possibly say that their statement in that regard is unworthy of belief and therefore not true.

McKee, a witness in the case, testified that children sometimes run across the avenue at the point in question. He explains that he meant they go at a faster "pace than a walk," and then says, most of them run across.

Can we, under such testimony, and because children are usually playful and disposed to run, say in the instant case, in spite of the testimony to which we have referred, that they did not walk across that avenue but ran to the eastern side?

If there were no evidence to the contrary, such an inference might be permissible; but in the face of the uncontradicted testimony on the subject, above referred to, such an assumption finds no justification in reason or law.

Reference by counsel is also made, in contending for such an assumption or inference, that these children were hurrying to their lunch that they might return to school for a little play before the school hour. The proof is that they had nearly an hour, if not a whole hour, ahead of them, before going back to the schoolroom. Their time was not so short as to impel a hurried return as it is suggested. On the other hand, it may be remarked that Mrs. Berdon, it is shown, was late at the time she was driving northward on the avenue when the accident happened, which she admits, but qualifies by saying, "not to hurt."

We would not, however, infer that she was driving at an excessive rate of speed just because she was late on that occasion, and independently of any other proof. Cases cannot be decided by such inferences or assumptions.

We must look to the testimony, facts, and circumstances, if there be any, for the solution of such questions, and cannot indulge in possibilities, probabilities, inferences, or assumptions of that character.

It is shown that it was customary for these school children and other pedestrians to cross that avenue from the north sidewalk of Kirby street. Hence, because Garland O'Pry was injured when crossing there, can he be reasonably imputed with having been guilty of rash or negligent conduct? He was going in that direction with his younger brother and elder sister, walking on the north sidewalk of Kirby street. When they reached the end of that sidewalk there were two ways opened to them to reach their home which was situated, as before stated, south of the line across the street from the sidewalk of Kirby street, and east of the east sidewalk of Louisiana avenue. Hence, when Garland, with Rodney and Armont, reached the terminus of the sidewalk on Kirby street, one way offered was for them to turn and go across Kirby street where it enters the avenue and get on the sidewalk along the west line of Louisiana avenue going south, and then to cross that avenue at Second street about a block below, so as to get to their point of destination for the midday lunch or to do as they did, walk across the avenue directly east from the sidewalk on Kirby street. In taking the way followed by Garland, his brother, and sister, we think, was better than the other offered, because if they had gone that way, it would have first required them to cross Kirby street in going directly south from the corner of that street down the west sidewalk of the avenue, and then again to cross that avenue in going to their home. In taking the route they selected, it was the more direct of the two and avoided the crossing of Kirby street and also the avenue. It is true that there was no continuation of Kirby street beyond the eastern sidewalk of the avenue, but we know of no law, municipal or statutory, rule or custom, which offered any inhibition against

the right of Garland O'Pry to cross the avenue at the point in question because Kirby street did not extend beyond the eastern boundary of that avenue, nor do we find any reason why it should be contended that it was more dangerous to cross the avenue where Garland was crossing it, than at any point below. It cannot therefore be said that Garland, by the mere fact of crossing the avenue directly from Kirby street, can be held of having been guilty of contributory negligence.

His sister, Armont, testifies that before crossing, she stopped and looked on both sides of the avenue before going across and saw no car coming.

Garland says he does not remember if he saw a car, and Rodney testifies he heard no noise, and that when he saw his brother fallen in the avenue, he ran for home from the sidewalk on the east side of the avenue where he had crossed ahead of his sister.

From the statement of these children as to whether they had looked ahead before crossing, there is nothing to indicate that there had been any pre-arranged story to be given by them.

It is shown that Garland was badly injured and suffered a severe shock, which, it is known, will some time cause a complete oblivion of what occurred immediately before the accident, which in all probability accounts for the fact that he could not remember if he had seen the car or not.

It is, however, shown by his elder sister, the one from whom more caution could be expected, that though she looked in both directions before going across, she saw no car coming. Why should we not believe that young girl's statement? And by what authority in law or reason can we cast her testimony aside when there is no evidence whatsoever to the contrary, testimonial or circumstantial? The only proof we have is from her that no car was then coming towards Kirby street from the south at the time Garland was going across following a few feet behind his sister. As Armont establishes the fact that no car was coming, Garland cannot be held to have been guilty of contributory negligence in going across the avenue at that time.

■ Garland was 12, and therefore must be held subject to the rule of contributory negligence.

We so held in the case of Marquette v. Cangelosi, 148 So. 88.

■ In going extensively over that subject in that case, we referred to the case of Westerfield v. Levis, 43 La. Ann. 63, 9 So. 52, 53, where the court said as follows:

"While an adult must be free from fault which contributed to his injury, in order that he may recover, the care and caution required of a child is according to his maturity and capacity and the circumstances of the particular case."

The above quotation shows that though a child of normal intelligence may be held to the rule governing the doctrine of contributory negligence, yet that it should be applied according to the circumstances of each particular case. Hence, the rule is not applied with the same severity to a child as it is to an adult.

In this case, however, it is not necessary to draw the distinction to which the law inclines, as the evidence we have above referred to shows that there is no proof that Garland O'Pry was guilty of any contributory negligence.

■ Frank Lebleu and James Lebleu both testify that Mrs. Berdon was traveling in her auto at the rate of about forty miles an hour when she passed by them, while they were fixing the tire on their auto on Louisiana avenue. They were then, as the record shows, about 250 feet from where the accident occurred. It is true that it is difficult to estimate with accuracy the speed at which an auto is traveling. When it is coming towards you, such an estimate is almost impossible; but when it goes by sideways, though the estimate cannot be exact, the speed may be approximately estimated.

In the instant case Mrs. Berdon testifies she was going, when the accident occurred, at 15 or 16 miles an hour. When she passed the Lebleus, we are confident from their testimony that she was going much faster than that, if not twice faster. Her own testimony is that she did not see Garland before she ran into him and that she did not see either his sister nor Rodney, who had actually gone across the avenue when the accident occurred. Obviously, her failure to see any of these children in an open avenue, and without any obstructions to her vision ahead of her, shows, to our minds, that she was listless, careless, or did not exercise the usual care that should be exercised by the driver of an auto, particularly towards a street that abuts on an avenue and from which children usually came to cross the avenue. We refer to her in particular because it is shown that she traveled along that avenue almost every day from the high school south of Kirby street where one of her children was then a pupil.

If she had been going at 15 or 16 miles an hour, as testified by her, it is impossible to believe that she would have failed to see Armont, Garland, or Rodney in time to stop her auto and to avoid the accident. The real cause of this accident, and the only way to account for it, must be ascribed to the excessive speed at which Mrs. Berdon was traveling when she passed near the Lebleus going northward on Louisiana avenue and in which she continued until Garland O'Pry was struck, a finding which is corroborated

by the distance her auto proceeded northeastwardly from the point of collision, to where it was found partly on the east curbing of Louisiana avenue after the accident.

As the record shows that the collision was caused by the carelessness, negligence, or fault of Mrs. Berdon, and to which Garland O'Pry did not contribute, the defendants were correctly held liable in damages.

### Quantum.

Garland O'Pry was badly injured, was ten days in the hospital, thirty days in bed, and for several months had to abstain from school. He suffered considerable pain, had to wear glasses after the accident, and had spells which his parents thought were caused by epileptic fits.

Physicians testified at length on epilepsy and its causes.

It is difficult for a court to clearly understand the difference between the causes that bring about such a disease. The evidence shows, however, that though these spells with which Garland suffered after he was injured were not proof that he was afflicted with epilepsy, still, from the testimony of the medical experts, it appears that traumatic epilepsy could have resulted from his injuries, and who did not say that it could not manifest itself in the future.

The court allowed $3,000, including the expenses incurred by plaintiff for physicians, drugs, and nurses.

We shall reduce that amount to $2,500, and as thus reduced, the judgment will be affirmed, finding that plaintiff is clearly entitled to that amount.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and is hereby amended by reducing it to $2,500, with legal interest as specified in the judgment, and as thus amended it be affirmed; appellee to pay the cost of this appeal, those of the lower court to be paid by defendants.